*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

|  |  |
|---|---|
| *In re* Guardianship of ER, Minor. | UNPUBLISHED<br>March 2, 2023<br><br>No. 362398<br>Montcalm Probate Court<br>LC No. 2022-034460-GM |
| *In re* Guardianship of GR, Minor. | No. 362399<br>Montcalm Probate Court<br>LC No. 2022-034461-GM |

### AFTER REMAND

Before: GLEICHER, C.J., and MARKEY and RICK, JJ.

PER CURIAM.

We remanded this matter to the probate court to gather up-to-date information and analyze the best-interest factors affecting ER and GR on the record before determining whether to terminate PT's guardianship over them. *In re Guardianship of ER*, unpublished opinion of the Court of Appeals, issued December 15, 2022 (Docket Nos. 362398, 362399) (*ER I*). The probate court conducted an evidentiary hearing and took judicial notice of the evidence gathered during earlier hearings in these guardianship proceedings, as well as in the related child protective proceedings. The court continued to find that it is in the best interests of ER to terminate PT's guardianship and continue his placement with his biological father. However, father signed a power of attorney for PT's neighbor to take custody of GR. During that time, PT demonstrated that she can provide care and custody for GR. And 15-year-old GR has made clear that she will live nowhere else. As a result, the probate court changed its earlier position and determined that maintaining PT's guardianship over GR is now in the child's best interests.

PT continues to challenge the termination of her guardianship over ER. We affirm.

# I. UPDATED FACTUAL BACKGROUND

On remand, the probate court conducted an evidentiary hearing and heard up-to-date testimony from PT, GR, PT's aunt, and the biological father's live-in partner. The court also considered case service plan updates authored since the termination of PT's guardianship.

Department of Health and Human Services (DHHS) reports described that PT had rectified the conditions that lead to the removal of her biological children from her home. Indeed, on January 4, 2023, the DHHS and PT reached a stipulation and order regarding her biological children. The order described that PT's biological children had been returned to her care on June 23, 2022. Since that time PT had been "participating in services," her "home conditions [had] been rectified and sustained," the children had "appropriate sleeping arrangements," and the home had running water, adequate food, and appropriate supervision. Accordingly, the DHHS agreed that termination of court jurisdiction was appropriate in relation to those children.

During the same time period, ER and GR had been placed in the home of their biological father. Father lived with his long-time girlfriend, SR, SR's children from a prior relationship, and their shared three-year-old son. SR described that GR was very aggressive in the home. GR was violent toward ER, disrespectful and disobedient to the adults, and raised her hand to strike her young half-brother. When the DHHS provided no help to protect the other children in the home, father sent GR to live with PT's neighbor. GR told anyone who asked, and expressly testified, that she wanted to live only with PT. While in the neighbor's care, PT took GR to counseling sessions and medical appointments, facilitated visits between GR and ER, and assisted GR with education.

ER's educational performance had improved while in his father's care. He also experienced no difficulty in his new home. Although PT testified that ER expressed his desire to return to her care, SR claimed that ER wanted to remain with his father.

At the close of the hearing, the court found that placing GR into a guardianship with PT was in the child's best interests. The court found it "clear that she does not have an emotional or a loving relationship with her father, and in fact, does not want to be in his home." The court acknowledged that "it took a significant amount of time to get [GR] into counseling," but that PT was ultimately the person who facilitated those services. Recognizing that a truancy petition had been filed while GR was in PT's care, the court noted that father had equal difficulty in that regard; GR missed the entire first month of school while in father's care. Moreover, the court found that "there was considerable tension, stress, and animosity from [GR] towards having to live in [her father's] home, making it a tense and stressful situation." The court carefully considered each best-interest factor and found that although a guardianship with PT was not a perfect solution, it was the best solution available under the circumstances.

The court weighed the contradicting accounts regarding ER's wishes and found, "I've heard nothing to suggest that [ER] does not love his father, doesn't want to be with his father." ER's homelife with his father was stable and satisfactory, after his chaotic life with PT. PT had undergone 10 prior Child Protective Services investigations and struggled to maintain a safe and suitable home. Father experienced none of these difficulties. And while in his father's care, ER had only missed one-and-a-half days of school and was "getting almost straight A's." After again

carefully considering each best-interest factor, the court found that termination of PT's guardianship was in ER's best interests.

## II. ANALYSIS

As noted in our prior opinion, we review for an abuse of discretion a probate court's determination whether to terminate a guardianship. *In re Guardianship of Redd*, 321 Mich App 398, 403; 909 NW2d 289 (2019). In a guardianship matter, we review for clear error the court's findings of fact regarding the children's best interests. *In re COH*, 495 Mich 184, 202; 848 NW2d 107 (2014).

> A finding is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. Thus, under the clear-error standard, a reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderates in the opposite direction. [*Id*. at 203-204 (quotation marks and citations omitted).]

Also as noted previously, the best interests of a minor in a guardianship proceeding are defined by MCL 700.5101(a) as "the sum total of the following factors":

(i) The love, affection, and other emotional ties existing between the parties involved and the child.

(ii) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue educating and raising the child in the child's religion or creed, if any.

(iii) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(iv) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(v) The permanence, as a family unit, of the existing or proposed custodial home.

(vi) The moral fitness of the parties involved.

(vii) The mental and physical health of the parties involved.

(viii) The child's home, school, and community record.

(ix) The child's reasonable preference, if the court considers the child to be of sufficient age to express a preference.

(x) The party's willingness and ability to facilitate and encourage a close and continuing parent-child relationship between the child and his or her parent or parents.

(xi) Domestic violence regardless of whether the violence is directed against or witnessed by the child.

(xii) Any other factor considered by the court to be relevant to a particular dispute regarding termination of a guardianship, removal of a guardian, or parenting time.

The probate court scrupulously considered these factors in relation to each child separately, complying with this Court's remand order. In *ER I*, slip op at 1, we noted that "[t]he record evidence tends to support" the guardianship termination orders. That remains true with regard to ER. However, the up-to-date information provided at the January 11, 2023 hearing supports that returning GR to PT's guardianship is now in the child's best interests.

While ER was in PT's care, he lacked adequate food and clothing. He had poor hygiene because the mobile home in which the family lived lacked running water and heat. ER missed significant amounts of school. ER had lived through the turmoil of moving from home to home and being part of a child protective proceeding. It is undisputed that father was not involved in his children's lives for several years and had committed acts of domestic violence against ER's mother. SR testified that father had engaged in domestic violence once against her early in their 12-year relationship. However, the evidence also demonstrated that father had rectified his ways. The only turmoil in his home during ER's stay came from GR's acts of aggression. Father ensured that ER received medical and dental treatment. ER attended school regularly and earned good grades. Although ER had some discipline issues, father assisted ER to overcome those difficulties. Father permitted ER to visit with GR after she left the home. ER's home with his father was stable and nurturing and maintaining that home is in ER's best interests.

GR's situation is much more difficult. GR's mental health issues have pervaded her homelife for years. Her first guardian—her maternal grandmother—could not assist her troubled granddaughter and sent the children to PT's home. PT initially was not up to the task of caring for GR's needs. PT did not secure mental health services for GR and failed to ensure GR attended school. Father was equally not up to the task. GR was aggressive toward ER, SR, and her young half-brother, and openly defied her father. Father refused to secure mental health services for GR because he insisted she could not remain in his home. Once GR was placed in a neighbor's care, PT demonstrated that she could adequately care for and support GR. PT took GR to her medical and counseling appointments. She ensured that GR attended school and took her performance more seriously. PT also made physical improvements to her home to ensure its safety for her biological children and wards. While the situation is not perfect, PT's guardianship over GR is the best option available for the teenager.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Jane E. Markey
/s/ Michelle M. Rick